## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

| | |
|---|---|
| [UNDER SEAL], | Case No. |
| Plaintiffs, | COMPLAINT |
| v. | **FILED IN CAMERA AND UNDER SEAL PURSUANT TO 31 U.S.C. §3730(B)(2)** |
| [UNDER SEAL], | |
| Defendants. | **DO NOT PLACE IN PRESS BOX DO NOT ENTER ON PACER** |

## DOCUMENT TO BE KEPT UNDER SEAL

Joseph F. Bennett, #16290
Keith F. Cross, Esq., #8934
CROSS & BENNETT, L.L.C.
108 E. St. Vrain, #20
Colorado Springs, CO 80903
Ph.: (719) 633-1359
Fax: (719) 633-5788
jbennett@crossbennett.com
kcross@crossbennett.com

Jennifer M. Verkamp (OH 0067198)
Frederick M. Morgan, Jr. (OH 0027687)
Maxwell S. Smith (OH 0089398)
Morgan Verkamp LLC
35 East 7th Street, Suite 600
Cincinnati, OH 45202
Telephone:  (513) 651-4400
Fax: (513) 651-4405
jverkamp@morganverkamp.com
rmorgan@morganverkamp.com
msmith@morganverkamp.com

Attorneys for [UNDER SEAL]

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA *ex rel.* | : | |
| BD PARTNERS, LLC, | : | |
| | : | Civil Action No. _____ |
| Plaintiff and Relator, | : | |
| | : | |
| v. | : | |
| | : | Honorable _____ |
| UNITEDHEALTH GROUP, Inc., | : | |
| UNITEDHEALTHCARE, and OPTUM, | : | |
| | : | **FILED IN CAMERA AND** |
| Defendants. | : | **UNDER SEAL PURSUANT TO** |
| | : | **31 U.S.C. § 3730(b)(2)** |
| | : | |
| | : | **DO NOT SERVE** |
| | : | |

**COMPLAINT FOR VIOLATIONS OF THE FALSE CLAIMS ACT**

## I.   INTRODUCTION

1.      Relator, by and through its attorneys, brings this action on behalf of the United States and itself against Defendants UnitedHealth Group, Inc., and its subsidiaries, UnitedHealth and Optum, to recover damages and civil penalties under the False Claims Act, 31 U.S.C. § 3729, *et seq.*

2.      Defendant UnitedHealth Group (UHG) provides health insurance to Medicare beneficiaries through coordinated care organizations such as HMOs. UHG is the largest administrator of Medicare Advantage plans in the United States.  It offers, among other things, Medicare Advantage plans and affiliated Medicare Prescription Drug Plans in markets across the United States under Parts C and D of the Medicare program. Medicare Parts C and D contemplate that plans will compete in good faith for members based on the value they offer Medicare beneficiaries through plan offerings, with the goal that arms' length competition will ultimately drive down costs for Medicare beneficiaries and the United States.

-1-

3.      Instead of operating within those conditions, UHG offers incentives to physicians and physician groups to induce them to refer Medicare beneficiaries to it for the purpose of expanding its Medicare Advantage census, in violation of the Anti-Kickback Statute (AKS), 42 U.S.C. § 1320a-7b, and the False Claims Act (FCA), 31 U.S.C. § 3729.

4.      Specifically, UHG offers physician groups illegal remuneration for each beneficiary that is or becomes a UHG Medicare Advantage plan member, under the guise of gainsharing, capitation, and other financial arrangements that provide payments to physician groups that are commercially unreasonable and for greater than fair market value for the services rendered.  UHG uses these sham arrangements to purchase revenue streams in the form of referrals for the selection of health care services paid for by Medicare Parts C (Medicare Advantage) and D (Prescription Drug benefits).

5.      UHG also engages in self-dealing through further manipulation of gainsharing and capitation arrangements by paying its own wholly-owned subsidiaries United Healthcare and Optum, which own and operate physician groups, unwarranted remuneration to induce them to refer patients to UHG for the provision of health insurance through Medicare Part C and Part D plans.

6.      The purpose of these payments is to grow and retain membership. These additional payments, though cloaked under the umbrella of gainsharing and capitation arrangements, result in significant additional funds being funneled into the providers' pockets, and are intended to and do induce the referral of Medicare beneficiaries into UHG plans.

7.      By offering physician groups the opportunity to realize excess profit for each beneficiary referred to it, UHG violates the AKS, compliance with which is a material condition of payment of all Medicare claims.  By offering and accepting such incentives, Defendants

United Healthcare and Optum also violate the AKS.  Defendants' actions are in knowing violation of material conditions of payment and result in false claims to the United States.

8.      This scheme to induce physician groups to refer Medicare beneficiaries to UHG for the provision of health care insurance in the form of Medicare Advantage (formerly "Medicare+Choice") plans under Medicare Part C began in 1996 and has included Medicare Prescription Drug Plans under Medicare Part D since 2006.  This scheme expanded in 2007 to include arrangements in widespread geographies across the country, including without limitation Arizona, California, Colorado, Florida, Illinois, Missouri, Oklahoma, Washington, Wisconsin, Texas, and Utah and, and is ongoing.

9.      All claims for payment submitted by Defendants under Medicare Parts C and D resulting from beneficiaries referred pursuant to kickback arrangements that violate the AKS are ineligible for reimbursement by the Medicare Program. As a consequence, the United States has been damaged, as set out more fully below.

## II.   <u>JURISDICTION</u>

10.     This action arises under the Civil False Claims Act, 31 U.S.C. § 3729 *et seq.*

11.     The Court has subject-matter jurisdiction pursuant to 31 U.S.C. § 3732(a)-(b) and 28 U.S.C. § 1331, and has personal jurisdiction over the Defendants because the Defendants do business and are located in this district.

12.     Venue lies under 28 U.S.C. § 1391(b)-(c) and 31 U.S.C. § 3732(a) because Defendants operate and transact business in this district. UHG conducts many western operations and enters into contracts related to the programs detailed in this complaint within this district.

13.     The allegations in this complaint have not been publicly disclosed in a criminal, civil, or administrative hearing, nor in any congressional, administrative, or General Accounting Office report, hearing, audit, or investigation, nor in the news media.

14.     Relator is an original source of the information upon which this complaint is based, as that phrase is used in the False Claims Act. 31 U.S.C. § 3730(e)(4)(B).

15.     Relator disclosed the allegations of this complaint to the United States prior to filing this complaint under the False Claims Act.

## III.     PARTIES

16.     The real party in interest to the claims in this action is the United States of America.

17.     Relator BD Partners, LLC is a Delaware limited liability corporation.

18.     UnitedHealth Group, Inc., is a diversified health care company headquartered in Minnetonka, Minnesota. It is the parent company of UnitedHealthcare and Optum. It is a resident of Minnesota and transacts business in this jurisdiction through its subsidiaries.

19.     UnitedHealthcare (UHC)[1] is a subsidiary of UHG that offers managed care products in both commercial and government-payer markets. It and its parent corporation are headquartered in Minnetonka, Minnesota. UHC is licensed in jurisdictions across the United States, including Colorado, as a managed care provider. One sector of its business, UHG Medicare and Retirement (UHG M&R, formerly UHG Ovations),[2] administers healthcare plans under Medicare Parts C and D. As of the end of 2014, it insured approximately 3,000,000 (three

---

[1] UHG entered an enterprise reorganization period in approximately 2011-2012 during which it retired certain brands that had been acquired in previous years in favor of adopting UnitedHealthcare as a unified brand.

[2] For convenience, this complaint will refer to both UHG Ovations and UHG Medicare and Retirement as "UHG."

million) Medicare beneficiaries through its Medicare Part C and affiliated Medicare Part D programs.

20.     Optum is a subsidiary of UHG that consists of OptumInsight, a health data analytics company; OptumRx, a pharmacy benefits manager that includes most UHG insureds; and OptumHealth, a company that offers ancillary benefits such as behavioral health, dental, and vision services, as well as owning and operating a number of physician practice groups. Its United States headquarters are located in Minnetonka, Minnesota. It transacts business in several states across the country through its management of physician groups, as described below.

## IV.     EVIDENTIARY BASIS FOR RULE 9(B), FED. R. CIV. P. ALLEGATIONS

21.     Some of the documentary evidence necessary to prove the allegations in this complaint, such as the documents related to claims submitted to Medicare, is in the exclusive possession of either the Defendants or the United States.

22.     With respect to each allegation herein Relator makes upon information and belief, Relator has, based upon knowledge, data, and experience, a reasoned factual basis to make that allegation, but lacks complete details of it.

23.     Relator is familiar with Defendants' policies and procedures, and has personal knowledge that false claims were submitted as a result of the schemes alleged herein.

## V.     BACKGROUND

### A.     Medicare

24.     Medicare is a federal health care program created by statute, administered by the federal government, and funded by taxpayer revenue. 42 U.S.C. § 1395 *et seq.* The program is primarily for the benefit of the elderly. The United States Department of Health and Human

Services (HHS), through the Centers for Medicare and Medicaid Services (CMS), administers the Medicare program.

25.     Medicare reimburses health care providers for health care benefits, items, and services, including pharmaceutical drugs and supplies, rendered to eligible beneficiaries.

26.     Under "Original Medicare" (Parts A and B), the United States pays hospital (Part A) and medical (Part B) costs on behalf of eligible beneficiaries. Under Medicare Part D, the United States pays for prescription drug coverage for beneficiaries through contracted Prescription Drug Plan Sponsors.

27.     As described more fully below, under Medicare Part C, also known as the Medicare Advantage (MA) program (formerly "Medicare+Choice"), beneficiaries eligible for coverage under Original Medicare can opt to enroll in private health insurance plans provided by, for example, Health Maintenance Organizations (HMOs).[3] The Medicare program contracts with these private health insurance plans to provide enrolled members at least the benefits covered under Original Medicare.

28.     Medicare pays a capitated (per member, per month) amount to the private health care plan for each enrolled plan member's care. The amount is adjusted by a risk score calculated for each beneficiary to reflect the increased risk associated with insuring sicker beneficiaries. Depending on the plan, beneficiaries may also pay a monthly premium and/or co-pays and other cost-sharing. Most Medicare Advantage plans, including many operated by Defendants, include prescription drug coverage under an associated Part D plan.

---

[3] Medicare Part C also allows the government to contract with other types of health insurance plans, such as Special Needs Plans and Preferred Provider Organizations. This complaint, however, concerns HMOs.

## 1.    Medicare Part C

29.    The Medicare Modernization Act of 2003 established the "Medicare Advantage" program, an expansion of the earlier "Medicare+Choice" program that had been created by the Balanced Budget Act of 1997. From 2003 to 2014, the number of Medicare-eligible beneficiaries enrolled in Medicare Advantage plans has grown from 5.3 million 15.7 million (or from 13% to 30% of Medicare beneficiaries). Enrollment growth is expected to continue. Of the 15.7 million Medicare Advantage enrollees in 2014, 64% were enrolled in HMO plans.

30.    Part C HMO plans contract with providers of medical services, such as physician groups, hospitals, ambulance providers, and diagnostic laboratories, to form care networks. Such networks must be adequate to provide a minimum basket of Medicare services, together with any additional benefits the plan provides.

31.    The hubs of these networks are physician groups. Once a Medicare beneficiary selects a Medicare Part C plan, the Primary Care Physician (PCP) becomes responsible for his or her overall health care. The PCP is often of the beneficiary's own choosing; whether the beneficiary's chosen PCP is within the plan's network is often a key consideration in the beneficiary's choice of plan. But if the beneficiary has not chosen a PCP, the plan will assign one. Under the HMO model, the PCP serves as the beneficiary's primary point of contact for healthcare needs.

## 2.    Competition Between Medicare Advantage Plans

32.    Medicare Part C is ostensibly driven by market forces. Medicare Advantage plans compete in two ways: first, through annual competitive bid submissions to CMS in order to establish plan benefit packages and second, in the open market for members. This competition is intended to accomplish the twin goals of the Medicare Part C program, reducing overall medical

costs for beneficiaries (and thereby for Medicare), and providing greater benefits and choices for insureds than available under fee-for-service Medicare, paid for by savings generated by the efficiencies of managed care. Medicare Managed Care Manual, ch. 1, § 10.

33.     Each year, organizations intending to offer an MA plan in a given area submit a bid to CMS, estimating the revenue they will require to provide Original Medicare services for the "average" Medicare beneficiary in the coming calendar year (the "Standardized Bid"). 42 C.F.R. § 422.254(b). The bid must break out:

> (i) The unadjusted MA statutory non-drug monthly bid amount, which is the MA plan's estimated average monthly required revenue for providing benefits under the original Medicare fee-for-service program option (as defined in § 422.252).

> (ii) The amount to provide basic prescription drug coverage, if any (defined at section 1860D-2(a)(3) of the Act).

> (iii) The amount to provide supplemental health care benefits, if any.

*Id.* § 422.254(b)(1). The bid must "contain all estimated revenue required by the plan, including administrative cost and return on investment" and must provide for a level of cost sharing that is actuarially equivalent to the level of cost sharing for beneficiaries of Original Medicare. *Id.* § 422.254(b)(4).

34.     Plans also identify, in their bid, the supplemental benefits and/or reductions in copays or premiums, if any. *Id.* § 422.254(a)(1) and (d).

35.     CMS annually determines a "Standardized Benchmark," based on historical Medicare data and periodic readjustments. 42 C.F.R. § 422.258. The Standardized Benchmark is specific to each county or other MA local practice area. 42 C.F.R. § 422.252. When CMS receives a plan's Standardized Bid, assuming the plan is otherwise qualified, CMS determines payments to the plan for covering Original Medicare services by comparing the plan's bid to the Standardized Benchmark. 42 C.F.R. §§ 422.304 and 422.308.

36.     The Standardized Benchmark is the most CMS will pay a plan to cover an "average" enrollee. If the Standardized Bid equals the Standardized Benchmark, CMS will pay the plan the Standardized Benchmark.

37.     If the Standardized Bid exceeds the Standardized Benchmark, CMS will pay the plan the amount of the Standardized Benchmark to cover Original Medicare services and the plan's enrollees pay the difference between the Standardized Bid and the Standardized Benchmark as a premium, in addition to any other amounts for services not included in Original Medicare.

38.     For a plan with a Standardized Bid below the Standardized Benchmark, CMS will pay the plan the Standardized Bid amount, plus a percentage of the difference between the Standardized Bid and the Standardized Benchmark (the "Rebate"). *See generally* Medicare Managed Care Manual, ch. 6, § 60; 42 C.F.R. §§ 422.264 and 422.266.

39.     The plan must use the Rebate to provide supplemental non-drug benefits and/or reductions in beneficiary cost sharing, as outlined in its Standardized Bid.

40.     The precise allocation of the refund to provision of additional benefits or beneficiary cost sharing is a matter of negotiation between the Plan and CMS. 42 C.F.R. § 422.256. In the process of negotiation, CMS directs plans to allocate funds in order to maximize benefits to insureds. The reallocation of excess profits should result in savings to the United States or increased benefits for insureds.

41.     In addition to introducing elements of price competition between plans through the bidding process, CMS also incorporates competition between plans through creation of a marketplace where plans compete with each other for members. Once approved to participate in

a given market, a plan competes with other approved plans to attract and retain membership based on their network and the value and cost of their benefits package.

42.     MA plans have an annual opportunity to increase their membership. Medicare beneficiaries covered under Original Medicare or MA plans have the option annually to choose to leave Original Medicare and enroll in an MA plan, leave an MA plan and return to Original Medicare, or switch MA plans.[4] The annual election period takes place from October 15 to December 7 each year, with plan coverage beginning January 1 of the following calendar year, subject to certain exceptions. Generally, once enrolled, a beneficiary cannot disenroll except during the annual election period or during a special disenrollment period (January 1 to February 14). *See generally* Medicare Managed Care Manual, ch. 2 § 30.

43.     Through the bidding process, CMS works with plans to ensure benefit packages meet the needs of beneficiaries. It also ensures that detailed information about the plans is made available on an equal footing so that beneficiaries can make informed decisions about the plans that best meet their needs based on the value each provides.

44.     Of particular relevance to the allegations in this complaint, plans compete for members by assembling benefit packages that include (1) reduced or no premiums; (2) extra or more generous dental, eye, or prescription drug coverage; (3) access to a larger network of HCPs; or (4) other benefits. "Participating organizations are under continued competitive pressure to improve their benefits, reduce their premiums and cost sharing, and improve their networks and services, in order to gain or retain market share." Medicare Managed Care Manual, ch. 1, § 10.

---

[4] New Medicare beneficiaries may also enroll during an Initial Election Period of seven months, beginning three months before the individual becomes eligible for Parts A and B, and ending three months after the month of eligibility.

45.     It is important to CMS that plans compete for Medicare beneficiaries on the basis of the value of the benefits package offered. Because of the risk of beneficiary confusion or manipulation, marketing of MA plans is highly regulated and scrutinized.

46.     Medicare prohibits plans from competing for members by, for example, offering inducements such as cash or expensive gifts. *See* Medicare Managed Care Manual, ch. 3, § 70. Only nominal gifts are permitted—*i.e.*, worth less than $15 retail per targeted member and less than $50 per member per year. *Id.* Such gifts or promotions "[m]ust not inappropriately influence the beneficiary's selection of a provider, practitioner, or supplier of any service." *Id.* §70.2.

47.     As these regulations make clear, anti-competitive conduct such as paying bribes or kickbacks to inappropriately induce beneficiaries to choose one plan over another are anathema to the MA program. It eviscerates the carefully-orchestrated competitive elements in the program and perverts its utilization of free-market forces. Such conduct, which corrupts the fundamental features of the program, is material to the government's decision to pay private health insurance companies to manage Medicare beneficiaries' medical care.

### 3.   Primary Care Physicians Influence Beneficiaries' Choice of Medicare Advantage Plan

48.     Physicians commonly advise Medicare beneficiaries on how to choose between MA plans or between an MA plan and Original Medicare. Physicians exert considerable influence over their Medicare-eligible patients' decisions regarding whether to choose an MA plan and which MA plan to choose.

49.     Given the physician's role, there is a danger that physicians may influence beneficiaries based on their own financial interest rather than the beneficiary's best interest.

50.     MA marketing regulations recognize that beneficiaries may seek physicians' advice regarding MA plans and regulations permit physicians to counsel patients regarding

whether to enroll in an MA plan and which plan in which to enroll. However, the regulations caution: "Plan sponsors and providers who they have a relationship with, (contract or otherwise), that assist beneficiaries with plan selection should ensure that provider assistance results in plan selection that is always in the best interest of the beneficiary…." Medicare Managed Care Manual, ch. 3, § 70.12 .

51.     Specifically, CMS has expressed that it "is concerned with provider marketing activities" because:

- "Providers may not be fully aware of all plan benefits and costs."

- "Providers may confuse the beneficiary if the provider is perceived as acting as an agent of the plan versus acting as the beneficiary's provider."

- "Providers may face conflicting incentives when acting as a plan sponsor representative." Medicare Managed Care Manual, ch. 3, § 70.12.1.

52.     Therefore, CMS has said:

> To the extent that a provider can assist a beneficiary *in an objective assessment of his/her needs and potential options to meet those needs*, they may do so. Providers may engage in discussions with beneficiaries should a beneficiary seek advice. However, providers must remain neutral when assisting with enrollment decisions and *may not*….direct, urge or attempt to persuade beneficiaries to enroll in a specific plan based on financial or any other interests of the provider.

*Id.* (emphases added).

53.     Providers, to include the physicians and physician groups here, "may not…[a]ccept compensation directly or indirectly from the plan for beneficiary enrollment activities." *Id.*

54.     Even when a provider decides to affiliate itself with a new plan, CMS circumscribes how the provider announces the affiliation to the public and to patients. Medicare Managed Care Manual, ch. 3, § 70.12.2. Such announcements must take place through direct

mail, email, or over the phone—*i.e.*, not in the physician's office or other clinical setting. *Id.* Providers may not offer affiliation communications that describe the plans in any way without having had such materials approved by CMS prior to use. *Id.*

### 4.   Payment under Medicare Part C

55.    For each Medicare beneficiary enrolled in a Medicare Part C plan, the government pays the plan in advance a capitated monthly amount derived from a comparison of the plan's bid and CMS's benchmark, and that is adjusted by a "risk score" to reflect whether that particular member is more expensive to insure than the average Medicare beneficiary. 42 C.F.R. § 422.304. Medicare Part C plans also gain revenue from member premiums and, for employer-sponsored plans, employer premiums, as well as Part D payments if the plan includes a prescription drug benefit, thought the majority of its revenue comes from the federal government.

56.    CMS also makes additional payments to Medicare Part C plans in January, July, and August reconciling new encounter data that may have changed beneficiaries' risk scores and the payments due the plans for those beneficiaries with changed risk scores.

### B.   Gainsharing

57.    In the Medicare Advantage context, "gainsharing" refers to an arrangement in which an MA plan and a physician group agree to share savings resulting from reductions in costs for certain identified services.

58.    Under a typical contract between a physician group and an MA plan, the physicians perform medical services for MA plan members and the physician group then submits claims for those services to the MA plan, which pays the otherwise qualified claims on a fee-for-service basis. The physician group's and the plan's incentives are not aligned regarding cost

savings: While the plan seeks to reduce or control costs (*e.g.*, unnecessary tests or services that could be avoided through better disease management), the physician group makes more money by billing for more services.

59.     Gainsharing arrangements allow plans to align incentives of the physician group with the insurer's by allowing them to share savings generated by the program with the physician group.

60.     Such arrangements can be used by plans to bring the targeted costs (of a provider which the plan has identified based on claims data) into line, as long as the arrangement is tied explicitly to cost savings and not to incentivizing referrals. For example, if a physician group saw unusually high utilization for diabetes interventions, the plan might agree to split 50/50 any savings the group could generate (while not reducing medically necessary services) below a benchmark, based on past claims data.[5] The plan would work with the group on strategies for appropriately controlling such utilization, for instance, more closely and regularly monitoring the status of patients with diabetes.

61.     In practice, a plan might contract with a physician group regarding a number of targeted therapeutic areas in which the group is experiencing greater than average utilization. The aggregate of claims submitted for these therapeutic areas, and savings generated regarding them, would form the basis for the gainsharing program between the group and the plan.

62.     The HHS Office of Inspector General has "been very wary of gainsharing arrangements, because [they] implicate the…Federal anti-kickback statutes." Testimony of Lewis Morris, Chief Counsel to the IG, HHS, House Comm. on Ways and Means, Subcomm. on

---

[5] Gainsharing arrangements typically contain guarantees that clinical care must not be adversely affected, as measured by certain quality and performance metrics.

Health (Oct. 7, 2005). This is because such agreements violate the AKS if "one purpose of the cost saving payments is to influence referrals of Federal health care program business." *Id.*

63.     Of particular concern are programs that are "intended to foster loyalty" or "allow[] a physician to continue for an extended period of time to reap benefits of previously achieved savings or to receive cost-savings payments unrelated to anything done by the physician." *Id.* One of the hallmarks of a gainsharing arrangement that violates the AKS is rewarding "overall cost-savings without any way to identify what specific and measurable actions the physician has taken to generate" the savings. *Id.*

64.     The OIG has determined that gainsharing arrangements between hospitals and physicians "pose a high risk of abuse. In order to retain or attract high-referring physicians, hospitals will be under pressure from competitors and physicians to increase the percentage of savings shared with the physicians, manipulate the hospital accounts to generate phantom savings, or otherwise game the arrangement to generate income for referring physicians." OIG Spec. Adv. Bulletin, "Gainsharing Arrangements and CMPs for Hospital Payments to Physicians to Reduce or Limit Services to Beneficiaries," at 4 (July 1999). This is also true of the gainsharing arrangements described herein, as more fully set out below.

## VI.     APPLICABLE LAWS AND GUIDANCE

65.     Defendant UHG pays physicians and physician groups, including those owned by Defendant Optum, illegal kickbacks to induce them to refer patients. As a result of these illegal inducements, physicians refer Medicare patients to UHG's Medicare Advantage plans.  By so doing, Defendants submit false claims for payment and cause physicians to submit false claims for payment in violation of the Anti-Kickback laws.

-15-

A. **The Anti-Kickback Statute**

66.     Under the Medicare and Medicaid Patient Protection Act, 42 U.S.C. § 1320a-7b(b) (the "Anti-Kickback Statute" or "AKS"), it is unlawful to knowingly offer or pay any remuneration in cash or in kind to induce another to refer an individual for the furnishing or the arranging of furnishing of any item or service for which payment may be made in whole or in part under a federal healthcare program, including Medicare. Violation of the statute can subject the perpetrator to criminal and civil penalties, as well as exclusion from participation in government healthcare programs.

67.     The AKS also provides that claims arising out of violations of its provisions are false claims. A claim "that includes items or services resulting from a violation of [the AKS] constitutes a false or fraudulent claim" for purposes of the False Claims Act. 42 U.S.C. § 1320a-7b(g).

68.     The AKS defines the term "Federal health care program, as pertinent here, as "any plan or program that provides health benefits, whether directly, through insurance, or otherwise, which is funded directly, in whole or in part, by the United States Government (other than the health insurance program under chapter 89 of title 5 [*i.e.*, insurance for government employees])." 42 U.S.C. § 1320a-7b(f).

69.     The AKS is designed, *inter alia*, to ensure that healthcare providers' decisions regarding patient care will be based solely on the best interests of the patient, and not improperly influenced and corrupted by the financial interest of the healthcare provider.

70.     Offering or paying remuneration of any kind violates the statute if one of the purposes of payment is to induce referrals.

71.     The term "remuneration" includes anything of value, in whatever form, whether in cash or in kind, offered directly or indirectly.

72.     Remuneration offered or paid in return for the promise to send patients to a particular provider qualifies as a kickback. Giving a person the opportunity to earn money for referring patients may also constitute an inducement under the AKS. Moreover, payment exceeding fair market value is in effect deemed payment for referrals. *Am. Lit. Soc. v. Thompson*, 215 F. Supp. 2d 23, 27 (D.D.C. 2002); *see also United States v. Rogan*, 459 F. Supp. 2d 692, 716 (N.D. Ill. 2006), *aff'd* 517 F.3d 449 (7th Cir. 2008)(intent to induce can be inferred from evidence of gross overpayment for professional services).

73.     Government healthcare programs require every provider who seeks payment to sign agreements with the United States in order to establish their eligibility to seek reimbursement.  MA regulations specifically require that the "MA organization agrees to comply with Federal laws and regulations designed to prevent or ameliorate fraud, waste, and abuse, including, but not limited to, applicable provisions of Federal criminal law, the False Claims Act (31 U.S.C. 3729 et. seq.), and the anti-kickback statute (section 1128B(b)) of the Act)."  42 C.F.R. § 422.504(h).

74.     Compliance with the AKS is a material condition of payment for all claims submitted for reimbursement by Medicare.

75.     In addition to this clear statutory proscription, UHG certifies each month to CMS that it is in continuous compliance with all of the CMS Part C and Part D guidelines, including marketing regulations and the AKS.

76.     Claims submitted or caused to be submitted while in knowing violation of the AKS are false claims.

B.      **The False Claims Act**

77.     The False Claims Act prohibits (a) knowingly presenting or causing to be presented a false or fraudulent claim; (b) knowingly making, using, or causing to be made or used, a false record or statement material to a false or fraudulent claim; and (c) conspiring to violate either of the preceding provisions. 31 U.S.C. § 3729(a)(1)(A)-(C). Any person who violates the FCA is liable for treble the amount of damages sustained by the United States and plus civil penalties of between $5,500 and $11,000 per claim.

78.     The FCA defines "knowingly" as "hav[ing] actual knowledge of the information," "act[ing] in deliberate ignorance of the truth or falsity of the information," or "act[ing] in reckless disregard of the information." 31 U.S.C. § 3729(b)(1). It requires no proof of specific intent to defraud." *Id.*

79.     The FCA defines "material" as "having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property." 31 U.S.C. § 3729(b)(4).

VII.    **FACTUAL ALLEGATIONS**

80.     Relator's central allegation is that UHG used a complex regulatory regimen to hide a simple, plainly-illegal fraud. The Medicare program permits "gainsharing" contracts, which are intended to allow doctors and insurers to collaboratively target areas of overutilization of health services and "share" in the financial "gain" which that collaboration produces. Instead, UHG uses purported gainsharing and other financial arrangements to funnel millions of dollars to physician groups for doing nothing more than working to increase the beneficiary census in UHG's Medicare Advantage plans. Because these huge payments were not and are not keyed to specific areas of overutilization, and because the physician groups spend the money UHG pays under these agreements on themselves, rather than their patients, the only gains which are shared

-18-

are those which go to the bottom line of the physician groups. By paying doctors to refer patients instead of providing them with better treatment, UHG corrupts the laudable goal of collaborating to improve the health of elderly Americans into a cynical scam to divert ever more federal healthcare dollars to itself while dumbing down the overall quality of care its millions of patients receive.

81.     UHG's per-click incentive system violates the AKS and results in false claims to the United States.

### A.     UHG's Scheme Targets Certain High Volume Physicians and Groups

82.     UHG's[6] default business model is to enter into fee-for-service contracts with physician groups that have Medicare-eligible patient populations. Under these arrangements the group provides services to UHG members and bills the plan at contracted rates. Indeed, the majority of UHG's physician groups have only fee-for-service contracts.

83.     UHG opportunistically departs from this model in certain markets to induce physicians and groups with a large Medicare populations to refer patients to UHG for the provision of health insurance, paid for in large part by federal health care programs. UHG offers some of these groups special gainsharing, capitation, and other financial agreements, which reward the group with significant revenue for every group Medicare beneficiary who becomes, or remains, a UHG insured.

### B.     UHG's "Additional Compensation Program"

84.     UHG enters into gainsharing arrangements with certain physician groups through its aptly named Additional Compensation Program.

---

[6] UHG Medicare & Retirement (UHG M&R or UHG), formerly UHG Ovations, is a wholly-owned UHG subsidiary. As an MA plan sponsor offering HMO plans across the United States, it submits and negotiates plan bids with CMS and receives payments from CMS for each Medicare-eligible beneficiary it enrolls in one of its MA plan offerings.

85.     UHG adds these contracts to fee-for-service contracts with physician groups that have large Medicare beneficiary populations. Under these arrangements, UHG and the physician group contract to share certain "cost savings" generated by the group. As described below, UHG manipulates these programs in ways unique to each situation, but often by setting high targets for the "Medical Loss Ratio" (MLR)[7] regarding services subject to the agreement, and then keeping the targets high for years, long after any savings have been achieved. The phantom savings produced by these agreements result in enormous profits for the doctors, with no tangible benefit to Medicare beneficiaries.

86.     UHG exploits the laudable concept of gainsharing based on results to pay kickbacks to physician groups, untethered to any legitimate services. The purpose of the agreements is merely to provide physicians with more money for shifting beneficiaries to UHG's Medicare Advantage plans rather than Original Medicare or other Medicare Advantage plans.

87.     By way of example, UHG has had a fee-for-service contract with Provider Group A[8] since the early to mid-1990s. In about 1996, UHG entered into an Additional Compensation Program contract with Provider Group A, a large group of doctors in St. Louis. In the agreement, UHG set a MLR "target" for the group that was 20% higher than the group's actual MLR, and agreed to split 70/30 in Provider Group A's favor most cost savings below the target.[9] The substantial delta between the target MLR and the actual MLR, split 70/30 in the provider's favor,

---

[7] As relevant here, the MLR is an insurance term representing total revenues received to insure a group of beneficiaries divided by the total expenditures spent on medical costs. If revenues for a group of insureds is $10,000 and $8,500 is expended on medical costs, that group has a MLR of 85%. Since 2013, the minimum MLR for Medicare Advantage and Medicare Prescription Drug plans has been set at 85% by statute and regulation. 42 U.S.C. § 1395w-22(e)(4); 78 F.R. 31284 (May 23, 2013).

[8] Relator has used generic identifiers for the names of these third parties to the complaint. Relator will provide these names to the United States and can further provide the names upon the Court's direction.

[9] The agreement excluded certain limited services over which the group had no utilization control and the agreement gave the group 100% of some cost "savings."

was not commercially reasonable. It transferred hundreds of thousands of dollars to the provider in return for negligible services. In doing so, it drove utilization (the portion of government funds utilized for actual patient care) to levels suggesting underutilization, with dollars that should have gone to patient care going to the group's bottom line instead.

88.     In 1997 Provider Group A's MLR dropped more than 20% from its 1996 level, to less than half the target MLR. UHG's membership there almost doubled. Under the agreement, UHG paid Provider Group A approximately 70% of the increased delta on almost double the membership—in addition to fees for the services the group provided per the underlying fee-for-service contract. The payment to Provider Group A this time quadrupled, amounting to millions of dollars. The "target" MLR did not change.

89.     The membership jump from 1996 to 1997 benefitted both the group and UHG under the contract because the increase in membership almost doubled the total revenue to which the Additional Compensation Program agreement applied.

90.     Unsurprisingly, the number of UHG members in Provider Group A's practice increased dramatically from 1996 through 2002, in lock step with Provider Group A's profit under the Additional Compensation Program.

91.     This arrangement remained in place, essentially unchanged, through at least 2014. Upon information and belief, it is still in place. Importantly, the "target" MLR remained unchanged despite the fact that the actual MLR remained 30% or more below the "target" MLR through at least 2013.

92.     Starting in 2003 the number of UHG members at Provider Group A started to decrease, but gradually. Nevertheless, its compensation under the ACP agreement continued to increase, per member, per month, during the same period. Upon information and belief, UHG

retained a significant portion of Provider A's patients as members because of the continuing kickbacks; membership would have dropped precipitously had the ACP agreement been rescinded. UHG executives specifically discussed the danger of losing membership when determining to maintain funding of these ongoing kickback arrangements.

93.     By maintaining the artificially high target MLR, UHG transfers millions of dollars annually to Provider Group A, for minimal if any legitimate benefit. The illicit benefit UHG achieves as a result of the kickbacks it pays is the maintenance of a large membership population at Provider Group A.

94.     UHG's Additional Compensation Program agreement with Provider Group B substantially replicates its agreement with Provider Group A.  In 2008 and 2009 Provider Group B's agreement provided for an artificially high "target" MLR and for any difference between the "target" MLR and the actual MLR to be split 60/40 in Provider Group B's favor.  Despite an actual MLR 2.15% below the benchmark in 2008, UHG revised the benchmark upwards 3% and changed the split to 50/50 in 2009.  This unwarranted change transferred millions of dollars to Provider Group B that it would not have received under the 2008-2009 terms.

95.     Provider Group B's MLR targets were increased each year from 2012 to 2014 (moving up 1% each year), yielding the group tens of millions of dollars in additional payments over the three year period that would not have been paid under the original or revised terms of the agreement. Upon information and belief, this arrangement did not change until Provider Group B converted to a global capitation agreement (an arrangement described below) in 2014.

96.     UHG also mixed cash and accrual based accounting (in direct contravention of Generally Accepted Accounting Principles (GAAP)) in order to increase payment to Provider Group B in 2008, its first year in the Additional Compensation Program. Using a cash-based

method, UHG counted a retroactive payment from CMS, which was received in 2008, but which covered a 2007 time-period, as revenue occurring in 2008; but it did not count the corresponding medical costs in 2008, instead accounting for them when they occurred, in 2007, under an accrual-based method. This had the effect of artificially enlarging the delta between target MLR and actual MLR during the first year of Provider Group B's Additional Compensation Program contract, and artificially increasing its payout under the contract by nearly a million dollars, with no additional effort on Provider Group B's part to justify the payment. The payment only enriched the kickback UHG was already providing to Provider Group B. This same accounting violation was used again in 2009 and 2010 to provide Provider Group B with additional unearned compensation.

97.     Thus, in order to incentive providers to refer Medicare beneficiaries, UHG uses multiple types of financial arrangements to funnel additional unearned payments to referral sources.

### C.     UHG's "Global Capitation Agreements"

98.     Another type of sham arrangement UHG uses to funnel extra money to physician groups are called "global capitation" agreements. Under these contracts, the group agrees to provide identified medical services (those regarding which they can influence utilization) to UHG's members for a capitated monthly rate that is some percentage of UHG's revenue for those beneficiaries. Like ACP arrangements, these arrangements are supposed to align the group's goals with the plan's goal (and CMS's goal) of controlling costs. UHG, however, enters into sweetheart global capitation deals with certain groups, setting the capitation rate several percentage points above what is commercially reasonable--*i.e.*, several points above the group's

current and historical MLR—in order to induce the groups to influence beneficiaries to enroll in UHG's Medicare Advantage plans.

99.     For example, UHG had fee-for-service contract with Provider Group C in 2011. In 2011 Provider Group C sent a letter to UHG (and most likely other Medicare Advantage plan providers) indicating it was in the process of evaluating it's "Medicare book of business" and that it was specifically "assessing the options for improving the value proposition for Original Medicare patients through Medicare Advantage," *i.e.*, it was considering whether to institute a Medicare Advantage-only policy.

100.     In the negotiation of the contract with UHG, Provider Group C represented that it would shift, and influence beneficiaries to choose, UHG's plans by narrowing down the total number of payers it contracted with (at the time, estimated by UHG to be almost 20) and steering its Original Medicare membership into one of the few remaining plans. It was understood that Provider Group C expected a "best and final" rate from UHG to win its business and that Provider Group C would make up UHG's margin reduction (resulting from the capitation deal) with an increase in current and future member volume.

101.     UHG then entered into a two year global capitation contract with Provider Group C, commencing in 2012, in which the capitation rate was set 6.5% higher than the group's historical MLR. Assuming Provider Group C's MLR remained static, this automatically transferred a substantial portion of revenue to Provider Group C per patient enrolled, or which Provider Group C could get to enroll, in UHG's plans. And Provider Group C, by reducing utilization, could increase its "profit" substantially. This deal, in practical terms, had no downside or risk for Provider Group C. Although by its terms the deal put it at risk of loss if utilization *soared*, as a practical matter based on historical trends that was not going to happen;

nor did the deal subject Provider Group C to long-term risk. In addition, the group was reinsured regarding the possibility of catastrophic loss.

102.    Absent the projected increase in UHG plan membership promised by Provider Group C, UHG's agreement to enter into a global capitation deal would not have been commercially reasonable.

103.     Although Provider Group C promised to shift many of its patients to UHG, it did not immediately come through on its promise, because it was too far into the open enrollment period to effectively influence beneficiaries' choices when the contract was accepted. It therefore did not substantially influence beneficiaries to move to UHG in 2012 (despite its representations to UHG), and UHG's rolls only increased to 4,670 members at Provider Group C.

104.    The global capitation agreement allowed Provider Group C to make a substantial profit on UHG enrollees in 2012, transferring millions of dollars to Provider Group C that it did not have the year before.

105.    UHG's inducement began to pay off handsomely when Provider Group C began referring more beneficiaries to UHG the next year, resulting in a 153% increase in enrollment in UHG's plans in 2013, with additional substantial increases in 2014, when the contract continued.

106.    UHG's total gross margin dipped during the first year under the contract, when it more than split its margin, per member, per month, with Provider Group C. But by offering Provider Group C the chance to make a huge profit on the group's UHG members, UHG's inducement paid off in 2013 and 2014, when its gross margin increased based almost entirely on increased enrollment.

107.    The global capitation agreement with Provider Group C did not incentivize the provider to lower overall MLR, which increased substantially during the first year of the contract

and remained high. Notwithstanding that the capitation program offered failed to lower overall MLR, the contract was renewed at the same capitation rate in 2014.  Notably, the contract *did* achieve UHG's intended purpose of increasing UHG's membership.

108.     UHG has also entered into global capitation agreements with physician groups owned by its subsidiary, Optum. UHG's subsidiary UHC's negotiation of these contracts with physician groups owned by one of its sister corporations was not at arms' length and resulted in very rich agreements for the physician groups. These agreements contain egregious terms that are similar to those contained in the agreements for Providers Group C, transferring unearned sums of federal health care dollars to UHG's subsidiary's bottom line. UHG directed and conspired with its subsidiaries to enter into financial arrangements which included illegal incentives in violation of the AKS.

### D.     Defendants' Payments to Physician Groups Constitute Kickbacks Prohibited by the AKS

109.     The AKS prohibits the knowing and willful offering of "any remuneration," "directly or indirectly, overtly or covertly, in cash or in kind" to induce a person to refer an individual for the furnishing or arranging of furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program. 42 U.S.C. § 1320a-7b(b)(2).

110.     As the OIG has long made clear, gainsharing programs implicate anti-fraud and abuse laws like the AKS, because they have the potential to influence physicians participating in them to refer beneficiaries to a particular provider on account of their own financial interest rather than the beneficiary's best interest.

111.     The gainsharing programs (both the Additional Compensation Program and global capitation agreements) UHG offers to physician groups provide the groups with the

opportunity to increase payments to themselves solely by switching patients from Original Medicare or other MA plans to UHG plans, increasing UHG's membership and the pool of revenue to which the agreements apply, of which they were promised a significant share.

112.    And that share was not commercially reasonable or fair market value for the services the physicians rendered under the agreements. These agreements were not commercially reasonable because they were initiated at benchmark rates that were drastically above a group's historical MLR, and were therefore untethered from data justifying the rate in support of a legitimate business rationale. That is, they created phantom savings—one of the hallmarks of a gainsharing agreement that violates the AKS.

113.    For example, Provider Group A's initial, pre-Additional Compensation Program MLR was almost 10% below its initial target MLR. From the beginning, the group was virtually guaranteed to make a substantial profit even if it did *nothing* to lower the MLR. Similarly, UHG set the benchmark for Provider Group C several points higher than its historical MLR.

114.    The agreements were also not commercially reasonable because they were not rebased over time. As the OIG's chief counsel noted, programs that are "intended to foster loyalty" or "allow[] a physician to continue for an extended period of time to reap benefits of previously achieved savings or to receive cost-savings payments unrelated to anything done by the physician" may violate the AKS because one purpose of such programs may be to induce physicians to refer beneficiaries to the provider of such payments.

115.    Here, the target MLRs for UHG's Additional Compensation Program and capitation arrangements were not rebased over time. Even if they resulted in lower MLRs initially, as Provider Group A's did, the target MLR was not rebased for over a decade and no additional savings were achieved. By not rebasing the ACP agreement with Provider Group A,

UHG continued to transfer money to the group that was not earned. The payments constituted kickbacks in the guise of gainsharing payments.

116.     Nor did the physician groups provide services that were fair market value for the payments made. Some groups did little more than open monthly data files sent by UHG, while others failed even to do that much. Most groups had difficulty articulating what activities they were implementing under the programs and looked to UHG for direction on cost saving opportunities, which was not forthcoming until five years into the program (2011) and, when provided, was generally deemed deficient. The programs were not geared to help physician groups properly control costs; they were geared to rewarding plans for funneling Medicare beneficiaries to UHG plans.

117.     These corrupt payment programs, which allowed physician groups to benefit from artificially achieved "savings" (through manipulation of the target MLR) and to continue to reap the benefits of any past savings achieved (by not rebasing the agreements) were initiated and kept in place to foster physicians' loyalty to UHG in order to increase its membership. In short, the purpose of these programs was to induce the referral of Medicare beneficiaries into UHG plans. These practices violate the Anti-Kickback Statute.

### E.     Defendants Submitted False Claims For Payment that Violated a Material Condition of Payment under Federal Health Care Programs

118.     Medicare Advantage regulations specifically require that the "MA organization agrees to comply with Federal laws and regulations designed to prevent or ameliorate fraud, waste, and abuse, including, but not limited to, applicable provisions of Federal criminal law, the False Claims Act (31 U.S.C. 3729 et. seq.), and the anti-kickback statute (section 1128B(b)) of the Act)."  42 C.F.R. § 422.504(h).

119.     Compliance with the AKS is a prerequisite to a provider's right to receive or retain reimbursement from Medicare Parts C and D, and, so, is a precondition for payment under Medicare Parts C and D. The submission of a claim for payment for a service that resulted from a kickback prohibited by the AKS is a false or fraudulent claim under the False Claims Act, because such claims are not eligible for payment.  The United States would not have paid such claims had it known of the kickbacks. 31 U.S.C. § 3729(a)-(b); 42 U.S.C. § 1320a-7b(b), (f), (g).

120.     CMS requires that MA plans supply a "Certification of Monthly Enrollment and Payment Data" with each monthly request for capitated payments. The plan certifies that, "[b]ased on best knowledge, information, and belief, all information submitted to CMS in this report is accurate, complete, and truthful." The plan also certifies that it has reviewed CMS monthly membership reports and has submitted more accurate information, if any, and that, for any portions of CMS monthly report to which the plan has not filed any objections, the plan attests to the accuracy, completeness, and truthfulness of that information, based on best knowledge, information, and belief.

121.     UHG's claims and certifications were false as to members enrolled in UHG plans as a result of kickbacks provided to physician groups, as described in this complaint. Capitated payments for such members were not due and owing to UHG from the United States Treasury, because such members were obtained in violation of a material condition of payment: compliance with the AKS. Because UHG was not owed payment for such kickback-tainted claims, the submission of claims for payment for those members were false claims.

122.     CMS also requires Medicare Advantage providers to certify the accuracy and truthfulness of the information contained in their bids under the Medicare Parts C and D programs. Upon information and belief, UHG did not disclose to CMS that it paid large sums of

money to physician groups to induce the referral of business paid for under Medicare Parts C and D.  Instead it disguised such costs as medical costs paid out to cover beneficiaries' health care. These statements were false and were material to CMS's decision to contract with UHG under the Parts C and D programs.

123.     In addition, false statements which drive up the appearance of legitimate costs also artificially drive up the amount by which UHG is paid in any given year. *See supra*, ¶¶ 33-40. Thus, Defendants' scheme not only resulted in the submission of noncovered and nonpayable claims in violation of the AKS, but also fraudulently affected the amount by which CMS reimbursed UHG under Medicare Parts C and D.

F.  **Defendants Acted Knowingly**

124.     UHG started experimenting with Additional Compensation Program agreements and precursor arrangements in the St. Louis, Missouri market in the late 1990s.  The Program rolled out nationally in 2007 and was overseen by an internal division called the Gainshare Program or Additional Compensation Program. It introduced these kickback contracts in Denver, Tucson, and Dallas in 2008; and Oklahoma City in 2009; since then the Program has continued to expand geographically, including without limitation to California, Florida, Illinois, Washington, Wisconsin, and Utah. UHG's executive leadership was notified on several occasions that the Program's methodologies caused concern regarding compliance with federal health care statutes and regulations, because it provided physicians with significant sums of money unrelated to any services performed. Attempts to change the practice and instead tie the payments within the program to value received were quashed by leadership, often citing the loss of membership that would occur if the agreements were rebased or discontinued.

125.     Some of the physician groups that had Additional Compensation Program agreements with UHG also expressed concerns that existing or proposed terms yielding them significant sums for little or no actual value raised compliance concerns. At least one group refused to agree to terms that yielded it more unearned payments; others, and UHG specifically, continued to engage in these agreements and even increased participation in them nationwide, from approximately 60 groups in 2011 to 100 in 2015. Despite these explicit concerns, UHG continues to engage in and expand these programs.

126.     Despite knowing about these compliance concerns, UHG executive leadership failed to rein in, correct, or end the agreements and has allowed them to continue, even touting the program's success internally.

127.     Defendants' knowing conduct violated the False Claims Act.

## COUNT I
## Violations of the False Claims Act

128.     The allegations in the foregoing paragraphs are re-alleged as if fully set forth herein.

129.      The False Claims Act, 31 U.S.C. § 3729(a)(1)(A), (B), (C), and (G) imposes liability upon, *inter alia*, those who knowingly cause to be presented false claims for payment or approval; make or use, or cause to be made or used, false records or statements material to a false claim; use false records or statements material to obligations to pay or transmit money or property to the government or conceal or improperly avoid or decrease an obligation to pay money to the government; or conspire to do any of these.

130.     The Anti-Kickback Statute, 42 U.S.C. § 1320a-7b, makes it illegal to offer and pay remuneration to induce a person to refer business paid for in whole or in part by Federal health care programs.

131.     By virtue of the acts described above, Defendants knowingly and willfully violate the Anti-Kickback Statute by offering and paying illegal remuneration to physician groups to induce the referral of business paid for by Federal health care programs under Medicare Parts C and D.

132.     Defendants know that claims flowing from violations of the Anti-Kickback Statute are not payable by Federal health care programs, including Medicare Parts C and D; that such nonpayable claims are false claims under the False Claims Act; and that submitting or causing the submission of such false claims creates liability under the False Claims Act.

133.     Defendants falsely represent compliance with the Anti-Kickback Statute in their contracts with and certifications to CMS. Defendants' false representations result in false claims to be submitted to Medicare Parts C and D.

134.     These claims result in significant reimbursement by the United States for amounts that it did not owe to Defendants.

135.     By virtue of the acts described above, Defendants knowingly present or cause to be presented false or fraudulent claims to government healthcare programs for payment or approval, within the meaning of 31 U.S.C. § 3729(a)(1)(A).

136.     By virtue of the acts described above, Defendants knowingly make, use or cause to be made or used false records and statements, and omits facts material to false or fraudulent claims to government healthcare programs, within the meaning of 31 U.S.C. §3729(a)(1)(B).

137.     By virtue of the acts described above, Defendants receive and conceal overpayments from government healthcare program funds for the provision of health insurance under Medicare Parts C and D.  Defendants make reverse false claims in violation of 31 U.S.C. § 3729(a)(1)(G) by retaining and failing to report overpayments for claims that are not owed to

them by the United States. Defendants ongoing and knowing failure to report these overpayments violates the False Claims Act, 31 U.S.C. § 3729(a)(1)(G).

138.     Defendants act knowingly, as that term is used in the False Claims Act.

139.     Defendants reached agreements to participate in these schemes with physician groups, and each of them engage in one or more overt acts in furtherance of the conspiracy. Defendants' acts to conspire among and between themselves violates the False Claims Act, 31 U.S.C. § 3729(a)(1)(C).

140.     The United States, unaware of the falsity of the records, statements, and claims made or caused to be made by Defendants, paid and continues to pay the claims that would not be paid but for Defendants' illegal conduct.

141.     Because the United States would not have paid for services which it knows to have been the result of false representations, the United States is harmed in an amount equal to the value the United States pays.

142.     The United States Government has been damaged, and continues to be damaged, as a result of Defendants' conduct in violation of the False Claims Act in an amount to be determined at trial.

## **PRAYER FOR RELIEF**

WHEREFORE, Relator requests:

A.     That the Court enter judgment against the Defendants in an amount equal to three times the amount of damages the United States Government has sustained because of Defendants' actions, plus a civil penalty of $11,000 for each action in violation of 31 U.S.C. § 3729, and the costs of this action, with interest, including the costs to the United States Government for its expenses related to this action;

B.      That in the event the United States Government intervenes in this action, Relator be awarded 25% of the proceeds of the action or the settlement of any such claim;

C.      That in the event the United States Government does not proceed with this action, Relator be awarded 30% of the proceeds of this action or the settlement of any such claim;

D.      That Relator be awarded all costs, attorneys' fees, and litigation expenses; and

E.      That the United States Government and Relator receive all relief, both at law and in equity, to which they may reasonably appear entitled.

<div style="margin-left:40%">

Respectfully submitted,

 *s/ Joseph F. Bennett*
Joseph F. Bennett, #16290
Keith F. Cross, #8934
Cross & Bennett, L.L.C.
108 E. St. Vrain, #20
Colorado Springs, CO 80903
Telephone: (719) 633-1359
Fax: (719) 633-5788
Email: jbennett@crossbennett.com
        kcross@crossbennett.com

 *s/ Jennifer M Verkamp*
Jennifer M. Verkamp (OH 0067198)
Frederick M. Morgan, Jr. (OH 0027687)
Maxwell S. Smith (OH 0089398)
Morgan Verkamp LLC
35 East 7th Street, Suite 600
Cincinnati, OH 45202
Telephone:  (513) 651-4400
Fax: (513) 651-4405
Email: jverkamp@morganverkamp.com
        rmorgan@morganverkamp.com
        msmith@morganverkamp.com

*Counsel for Relator BD Partners, LLC*

</div>

*DO NOT SERVE*
*FALSE CLAIMS ACT COMPLAINT FILED UNDER SEAL*

-34-